161 Wis.2d 1015 (1991)
468 N.W.2d 719
IN RE the PATERNITY OF C.A.S. and C.D.S.: W.W.W., Petitioner-Appellant-Petitioner,
v.
M.C.S., Respondent-Third Party-Petitioner-Respondent,
R.J.S., Third-Party-Respondent-Respondent.
No. 89-0265.
Supreme Court of Wisconsin.
Argued March 26, 1991.
Decided May 13, 1991.
*1020 For the petitioner-appellant-petitioner there were briefs by David E. Lasker and Julian, Olson & Lasker, S.C., Madison and oral argument by David E. Lasker.
For the respondent-third party petitioner-respondent and the third party respondent-respondent there was a brief by Richard J. Podell and Richard J. Podell & Associates, S.C., Milwaukee and oral argument by Richard J. Podell.
Guardian Ad Litem brief was filed by Patience D. Roggensack, Steven P. Means and Ross & Stevens, S.C., Madison and oral argument by Ms. Roggensack.
CALLOW, WILLIAM G., J.
This is a review of a decision of the court of appeals, In re the Paternity of C.A.S., 156 Wis. 2d 446, 456 N.W.2d 899 (Ct. App. 1990), which affirmed an order of the circuit court of Dane county, Judge Angela B. Bartell. The circuit court issued an order dismissing the petitioner-appellant-petitioner's (W.W.W.'s) petition that he be adjudicated the father of two children, C.A.S. and C.D.S. The circuit court dismissed the paternity petition pursuant to sec. 767.458(1m), Stats.,[1] on the ground that a judicial determination *1021 finding W.W.W. to be the father of C.A.S. and C.D.S. would not be in the best interests of the children.
There are three issues raised on appeal. First, W.W.W. contends that sec. 767.458(1m), Stats., as applied, infringes on his constitutional rights to establish his paternity of, and a relationship with C.A.S. and C.D.S. Second, he argues that he has a statutory right to a determination of paternity under sec. 767.45(1) which was violated in this case. Third, he contends that the lower courts misconstrued and misapplied the best interest of the child standard required by sec. 767.458(1m).
We first conclude that W.W.W.'s constitutional rights were not infringed by sec. 767.458(1m), Stats. His rights to establish his paternity of, and a relationship with the children do not warrant constitutional protection because his relationship with the children did not give rise to a liberty interest. Likewise, he does not have a statutory right to establish his paternity of C.A.S. and C.D.S. because the specific language of sec. 767.458(1m) is an exception to the statutory right to a determination of paternity granted by sec. 767.45(1)(d).[2]
*1022 We finally conclude that the lower courts did not misapply the best interest of the child standard under sec. 767.458(1m), Stats. The evidence in the record supports the circuit court's determination that it would not be in the children's best interests to allow a judicial determination that W.W.W. was their father.
The relevant facts follow. M.C.S. is the mother of five children. Each of these children was conceived during her marriage to R.J.S. M.C.S. and R.J.S. were married in 1967 and are still married. The two youngest children, C.A.S., born in 1982, and C.D.S., born in 1984, have lived continuously with M.C.S. and R.J.S. R.J.S. is listed as their father on their birth certificates, and has alleged that he is their father. He also is and has been responsible for their emotional and financial well-being.
M.C.S. and W.W.W. had sexual relations during the period of time when C.A.S. and C.D.S. were conceived.[3] Shortly after C.D.S. was conceived, M.C.S. and W.W.W. terminated their relationship. Although W.W.W. had infrequent contacts with C.A.S. prior to the end of his relationship with M.C.S., he did not have any contacts with either C.A.S. or C.D.S. thereafter. W.W.W. alleged that he did not support the children emotionally or financially, but was prevented by M.C.S. from establishing a relationship with the children.
On May 25, 1985, W.W.W. petitioned the circuit court for a determination that he was the father of C.A.S. and C.D.S., and he requested custody of the children and visitation rights. The circuit court appointed a guardian ad litem for the children. On October 10, 1985, M.C.S. moved for an order dismissing the action with *1023 prejudice, on the ground that the action was not in the best interests of the children.
A pretrial hearing was conducted before the assistant family court commissioner on October 16, 1985, pursuant to sec. 767.46, Stats. The commissioner concluded that a judicial determination of paternity was not in the best interests of the children, and recommended that the action be dismissed. W.W.W. refused to accept this recommendation and the matter was placed for trial.
M.C.S. moved for summary judgment and the guardian ad litem moved for judgment on the pleadings. The circuit court denied these motions, and granted W.W.W.'s request for blood tests, pursuant to sec. 767.48(1), Stats. The court of appeals denied a subsequent interlocutory appeal, and remanded the case to the circuit court. A subsequent reconsideration request before the court of appeals and a petition for review before this court were also denied. While these appeals were pending, the legislature amended the paternity statutes and created sec. 767.458(1m), effective August 1, 1987.
In light of the enactment of sec. 767.458(1m), Stats., the circuit court then granted a motion by M.C.S. and the guardian ad litem to stay this order for blood tests and ordered a hearing pursuant to sec. 767.458(1m). An evidentiary hearing was held on December 7, 1988 before the Dane county circuit court. The circuit court concluded that it was not in the best interests of the children to make a judicial determination of paternity, and dismissed the action with prejudice.
The court of appeals affirmed the order of the circuit court. This case is presently before this court on a petition for review pursuant to sec. (Rule) 809.62, Stats.

*1024 I.
In Kurtz v. City of Waukesha, 91 Wis. 2d 103, 116-17, 280 N.W.2d 757 (1979), we examined the need to serve the state attorney general with a copy of the proceeding if a statute is alleged to be unconstitutional. Although Kurtz involved the constitutionality of the Fair Employment Act, secs. 111.31-111.37, Stats. 1977-78, we adopted the rationale of sec. 806.04, Stats. 1977-78,[4] dealing with declaratory judgments. In Kurtz, we concluded that a pronouncement by this court on the constitutionality of an act was precedent no matter how the issue was presented, and we declined to review the issue because the parties had not given the state an opportunity to be heard. Kurtz, 91 Wis. 2d at 117.
In this case, also, the state did not receive an opportunity to be heard, although W.W.W.'s argument centers on the constitutionality of sec. 767.458(1m), Stats. W.W.W. argued or suggested the following constitutional challenges to sec. 767.458(1m):[5] (1) it violates his substantive due process rights guaranteed by the Fourteenth Amendment of the United States Constitution; (2) it violates the equal protection clause of the fourteenth amendment; (3) its retroactive application violates his right to procedural due process under the fourteenth amendment, (4) it violates Wisconsin Constitution art. I, sec. 1, (5) it violates Wisconsin Constitution art. I, sec. 9.
*1025 [1]
The rule discussed in Kurtz was relaxed somewhat in In Matter of Estate of Fessler, 100 Wis. 2d 437, 302 N.W.2d 414 (1981). In Fessler, we addressed the constitutionality of sec. 859.07, Stats. 1977, which dealt with notice by publication to probate creditors. We held that although the attorney general was not notified of the constitutional challenge before the probate court, this defect was cured because the attorney general was notified while the case was pending before the court of appeals. Fessler, 100 Wis. 2d at 441. In this case, because of the original failure to notify the attorney general,[6] and because the appellate court did not address these issues, we decline to address the constitutional issues raised by the petitioner other than his substantive due process challenge.[7]
*1026 We address the petitioner's substantive due process challenge, however, because it was considered by the court of appeals. In its decision, that court stated, "[t]hough [W.W.W.'s] argument could be interpreted as an assertion that sec. 767.458(1m) is unconstitutional, it could also be interpreted as an assertion that sec. 767.458(1m) does not apply to him. We give [W.W.W.] the benefit of the doubt and address his argument." C.A.S., 156 Wis. 2d at 454 n.2. Because the issue has been fully briefed by both parties and thoroughly considered by the court of appeals, we address this constitutional challenge.
W.W.W. argues that he has a protected liberty interest under the due process clause of the fourteenth amendment in a relationship with C.A.S. and C.D.S. He bases this contention on a string of decisions rendered by the United States Supreme Court. See Michael H. v. Gerald D., 109 S. Ct. 233 (1989); Lehr v. Robertson, 463 U.S. 248 (1983); Caban v. Mohammed, 441 U.S. 380 (1979); Quilloin v. Walcott, 434 U.S. 246 (1978); Stanley *1027 v. Illinois, 405 U.S. 645 (1972). Stanley, Quilloin, Caban, and Lehr each involved unwed fathers who claimed that they had been denied the equal protection and due process of the law under the rights guaranteed to them by the fourteenth amendment. In two cases (Stanley and Caban), the father had established a relationship with the children in question, and the Supreme Court found that the father's constitutional rights had been violated. In the other two cases (Quilloin and Lehr), no relationship had been established and the Court found no constitutional violations.
Michael H. involved a case where an unwed father had established a relationship with his natural child. Blood tests indicated a 98.07% probability that he was the natural father of a child born to the wife of another man. Michael H. challenged the constitutionality of Cal. Evid. Code Ann. sec. 621 (1989 West Supp.)[8] on the ground that it infringed upon his due process rights to establish a relationship with the child.
The plurality opinion (Scalia, J., Rehnquist, C.J., O'Connor, J., and Kennedy, J.) rejected the notion that biological fatherhood plus an established parental relationship was sufficient to establish a liberty interest. Michael H., 109 S. Ct. at 2342. The plurality found that Michael H.'s interest in a relationship with the child did not rise to the level of a liberty interest because that relationship was not historically treated as a protected family unit,[9] nor had this relationship been accorded *1028 special protection. On the contrary, they found that societal traditions had protected the marital family against claims such as Michael H.'s. Id. Hence, the plurality concluded that Cal. Evid. Code Ann. sec. 621 was not unconstitutional. Id. at 2345.
Justice Stevens concurred in the decision, but refused to foreclose the possibility that a constitutionally protected relationship between a natural father and his child may exist even under these circumstances. Id. at 2347 (Stevens, J., concurring). He was satisfied, however, that the statute as applied gave Michael H. the opportunity to establish this interest before a trial judge, and the statute therefore was not unconstitutional. Id.
The four dissenting justices (Brennan, J., Marshall, J., Blackmun, J., and White, J.) all believed that Michael H. had established a liberty interest in his relationship with the child, rejecting the notion that a father's rights are dependent on the marital status of the mother or the biological father. Id. at 2349 (Brennan, J., dissenting) and 2360 (White, J., dissenting). In contrast, these justices would ask whether the specific parent-child relationship under consideration was close enough to the interests that had been protected by earlier cases to be considered a liberty interest. Id. at 2352 (Brennan, J., dissenting). The dissent stated, "although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so." Id. In essence, "[t]his commitment is why Mr. Stanley and Mr. Caban won; why Mr. Quilloin and Mr. Lehr lost; and why Michael H. should prevail today." Id.
*1029 [2]
Michael H. controls the outcome of this case.[10] Under either analysis, W.W.W. has not established that he has a liberty interest in establishing his paternity of or a relationship with C.A.S. or C.D.S.[11] First, adopting the reasoning of the plurality in Michael H., W.W.W.'s *1030 relationship to the children (who were born to an extant marital family) is not a liberty interest. For the same reasons that the Supreme Court found that Michael H.'s interest was not one traditionally protected by society, we find that W.W.W.'s asserted liberty interest is not "rooted in history and tradition." Second, W.W.W. loses even under the rationale of the other justices. These justices did not foreclose the possibility that a putative father could never have a liberty interest in such a case, but instead concluded that the analysis should turn on the level of commitment to the responsibilities of parenthood the father demonstrates. Michael H., 109 S. Ct. at 2352 (Brennan, J., dissenting). The undisputed facts indicate that W.W.W. had only minimal contact with one of the children and did not have a relationship with either of them. We conclude that he did not have a liberty interest in determining his paternity of the children or in a parental relationship with them, as his existing relationship with them was not close to the type of relationship in which the Supreme Court had found a constitutionally protected interest to exist. See Stanley, 405 U.S. at 651 (children "sired and raised" by natural father); Caban, 441 U.S. at 382 (natural father lived with children for several years and held himself out as their father).
W.W.W. contends that he attempted to establish a relationship with the children, but that M.C.S. and R.J.S. frustrated his efforts. W.W.W. cites no case law, nor are we aware of any case law which supports his contention that these attempts should satisfy the requirement that an established relationship exists.
Finally, W.W.W. argues that his constitutional interest flows from our decision in Slawek v. Stroh, 62 *1031 Wis. 2d 295, 215 N.W.2d 9 (1974). In that case, the appellant Slawek commenced an action for declaratory judgment seeking a judicial declaration that he was the father of an illegitimate child born to the respondent. We concluded, "the plaintiff-appellant, as a putative father of an illegitimate child, does have the constitutional right to establish, if he can, his natural parentage, to assert parental rights, and a legal forum with due process procedures to establish these rights." Slawek, 62 Wis. 2d at 304.
[3]
Our decision today is not inconsistent with Slawek. As we recognized, the only specific statutory procedure for establishing the parentage of illegitimate children at the time Slawek was decided appeared in ch. 52, Stats. Id. Slawek was decided prior to the enactment of sec. 767.45, Stats., Determination of Paternity.[12]Slawek was also decided prior to the enactment of sec. 767.458(1m)[13] which specifically dealt with paternity actions brought by an alleged natural father of a child born to the wife of another man. Additionally, Slawek did not involve a situation where the children of the alleged natural father were born into an extant marital family, so this case is distinguishable. We do not disturb Slawek or suggest that a putative father may never have a constitutionally protected right to establish his parentage of an illegitimate child. Rather, we conclude that if a putative father of a child born to the wife of another man has not established an actual relationship[14] with that child, he does *1032 not have a constitutionally protected interest in establishing his parentage of the child, or in a relationship with that child.

II.
Likewise, W.W.W. does not have a statutory right to a judicial determination of paternity in this case. W.W.W. contends that this right flows from sec. 767.45(1)(d), Stats., and that the legislature did not intend to abrogate this right when it enacted sec. 767.458(1m). Consequently, W.W.W. contends that sec. 767.458(1m) must be interpreted very narrowly. He argues that the legislature did not intend to end the rule that a presumption of paternity could be rebutted by reliable evidence, as reflected in sec. 767.45. This lack of legislative intent is evident, he contends, from the fact that: (1) the legislature did not amend sec. 767.45 at the time it enacted sec. 767.458(1m), and (2) 1987 Wis. Act 413, sec. 1[15] includes a legislative declaration promoting the interest of children in knowing the identification of their parents.
[4]
W.W.W. further argues that this statutory right requires that he be given the opportunity to have a blood test, and that the best interest of the child inquiry should be limited to the question of whether the ordering *1033 of blood tests would bring no benefit to the children, or may actually harm the children. We do not find these arguments convincing. We find the language of sec. 767.458(1m), Stats., to be clear, unambiguous and not in conflict with sec. 767.45(1)(d). Section 767.458(1m) states: "If the judge . . . determines that a judicial determination of whether a man other than the husband is the father is not in the best interest of the child, no blood tests may be ordered and the action shall be dismissed." Clearly, the circuit court has the obligation to refuse to allow blood tests if these tests may result in a determination that W.W.W. was the natural father of the children, and such a determination would not be in the children's best interests.
[5]
W.W.W. contends that the best interest of the child inquiry should be different during the determination of paternity stage than at the dispositional stage (e.g., custody, visitation rights). We disagree. To allow a blood test in such a situation, and later determine at a dispositional hearing that it was in the best interests of the children to continue the children's relationship with the presumed father (husband of the mother), would in effect bastardize the children and rupture the existing father/child relationship. See Matter of Marriage of Ross, 245 Kan. 591, 783 P.2d 331, 338 (1990). Such damage would be irreparable. Id.
[6]
Section 891.41, Stats., provides that: "A man is presumed to be the natural father of a child if any of the following applies: (1) He and the child's natural mother are or have been married to each other and the child is conceived or born after marriage . . .." Section 767.45(1)(d), Stats., permits an alleged putative father like W.W.W. to rebut this presumption, consistent with *1034 the legislative intent that children should know the identification of their parents. 1987 Wis. Act 413, sec. 1. The language of sec. 767.458(1m) is specific and explicitly permits the court to prevent a blood test in such a situation, if it determines that such an order would not be in the best interests of the children. We do not find this language ambiguous or in conflict with sec. 767.45.
[7]
W.W.W. contends that the circuit court erred by applying sec. 767.458(1m), Stats., retroactively, because in doing so it denied him his vested right to a determination of paternity. We do not address the procedural due process implications of the retroactive application of sec. 767.458(1m) for reasons stated above. We conclude that the statute was intended to operate retroactively, and extends to situations such as this. We agree with the court of appeals' conclusion that although the statute was originally intended to apply prospectively, as a result of gubernatorial vetoes, the language of the statute was deliberately amended to allow its retroactive operation. See C.A.S., 156 Wis. 2d at 459-60. Because it was intended to operate retroactively to protect as many children as possible,[16] and because the language of sec. 767.458(1m) does not suggest a prospective application, we conclude, as the court of appeals did, that the circuit court properly applied sec. 767.458(1m) in this case.

III.
W.W.W. next argues that the lower courts misconstrued and erroneously applied the best interest of the child standard under sec. 767.458(1m), Stats. This argument is based on his belief that the lower courts' finding *1035 that a judicial determination of paternity was not in the best interests of the children: (a) was not faithful to the legislative intent that children know the identity of their parents, 1987 Wis. Act 413, sec. 1; (b) that the decisions of the lower courts did not comport with basic rules of statutory construction; and (c) that a determination of the circuit court ignored factors essential to the children's best interests.
[8]
We find none of these arguments persuasive. First, we do not find sec. 767.458(1m), Stats., to be in conflict with the policy of this state that children know the identification of their parents. This subsection represents a narrow exception to that policy; applying only in situations where a putative father alleges that he is the natural father of the child or children born to the wife of another man. Section 767.458(1m) does not automatically foreclose the possibility that a putative father may obtain a judicial determination of paternity. Rather, it forecloses such a determination only when the circuit court or court commissioner determines that such a determination would not be in the best interest of the child.
[9]
The United States Supreme Court has recognized the sanctity of a family unit and the traditional protections the marital family has received. Michael H., 109 S. Ct. at 2342. In Michael H., the Supreme Court was unwilling to look at the relationship of the putative father with the child in isolation, without reference to the existing family unit. Id. at 2342 n.4. In this case, R.J.S. claims both the children as his own, and has given them support both financially and emotionally. His relationship with the children is far more extensive than that claimed by W.W.W. In light of these circumstances, *1036 the decision to permit a blood test in this situation should not be made without considering existing relationships.
[10]
An existing marital unit is not a per se bar to a blood test, however. Ultimately, it is the manner in which this unit contributes to the best interests of the children that renders it significant. The best interests of the children are the ultimate and paramount considerations in this case, and reflect a strong public policy of this state. See, e.g., Adoption of Randolph, 68 Wis. 2d 64, 68, 227 N.W.2d 634 (1975) (the best interest of the child is paramount in adoption proceedings); In re Guardianship of Schmidt, 71 Wis. 2d 317, 328, 237 N.W.2d 919 (1976) (the best interest of the child is controlling in guardianship proceedings); In re Paternity of R.W.L., 116 Wis. 2d 150, 158, 341 N.W.2d 682 (1984) (interest of child is primary interest in paternity actions).
[11]
Secondly, we do not agree that the lower courts improperly construed sec. 767.458(1m), Stats., by ignoring the language of other sections of paternity law, which give the putative father the right to a blood test and a determination of paternity. Sections 767.45 and .48. As discussed previously, the language of sec. 767.458(1m) is specific and unambiguous, and does not conflict with more general sections such as sec. 767.45(1)(d), which give fathers the general right to establish their paternity.
[12-14]
Finally, in response to W.W.W.'s contention that the circuit court erred in applying the best interest of the child standard, we conclude that such was not the case. A determination of what is in the best interest of the child is a mixed question of fact and law. Randolph, 68 *1037 Wis. 2d at 69. The circuit court's findings of fact are sustained unless they are found to be against the great weight and clear preponderance of the evidence. Id. In determining the best interests of the children, it is within the province of the circuit court to determine what weight is given to expert testimony. In Matter of Adoption of R.P.R., 98 Wis. 2d 613, 619, 297 N.W.2d 833 (1980). The ultimate conclusion of the best interest of the child, however, is a matter of law which we review without deference to the circuit court. Randolph, 68 Wis. 2d at 69.
[15]
The best interest of the child standard is used in a number of legal actions concerning children. See, e.g., sec. 48.426, Stats. (termination of parental rights); sec. 767.24(2), Stats. (child custody determinations). The courts have not laid down definite guidelines to follow in making the best interest of the child determination. State ex rel. Lewis v. Lutheran Social Services, 59 Wis. 2d 1, 9-10, 207 N.W.2d 826 (1973). A determination of what is in the best interests of the children must be made considering all factors which weigh upon the children's interests.
The thrust of W.W.W.'s argument is not that the circuit court's findings of fact were erroneous, but rather that the circuit court ignored essential factors in concluding that a judicial determination of paternity was not in the best interests of the children. Specifically, W.W.W. contends that the testimony of Dr. Clarence Moore, his expert witness, was not given sufficient weight in the circuit court's determination of the best interests of the children.
Dr. Moore, a psychiatrist who was adopted as a child, testified at the best interest of the child hearing that it was in the best interests of the children to know *1038 their biological father. Such a conclusion was necessitated, according to Dr. Moore, because of long term emotional and medical problems that may arise. For example, a determination of paternity would allow the children to know their background and establish their identity, and would allow the family to come to grips with the problem of paternity early on, rather than later as a result of an escaped secret. Also, according to Dr. Moore, many diseases such as manic depression, heart disease and cancer are genetic and do not show up until later in life. It would be in the best interests of the children to alert them to these possible consequences at an early stage of life, so they could take precautions, according to Dr. Moore.
Two psychologists, Dr. Sandra Eisemann and Dr. Itzhak Matusiak, testified at the hearing for M.C.S. and R.J.S. These witnesses testified that it would not be in the best interests of the children to make a judicial determination of paternity. These witnesses both had contact with the children and both testified that it would not be in the children's best interests to go forward with the paternity determination. They stated that, in their opinion, telling C.A.S. and C.D.S. that R.J.S. was not their biological father could lead to a substantial risk of harm, regardless of how the information was presented. Dr. Eisemann testified that such a revelation could lead to the children developing a considerable distrust of relationships in the future, and could create considerable confusion in the children's own self-identity. Dr. Matusiak testified that the children were happy and secure in their present home and this information "would effectively destroy the essence or the basis for their understanding of themselves and where they belong, familial relationships with their parents, with their siblings, the sense of legitimacy that they currently enjoy within the *1039 context of that familial relationship." Dr. Matusiak also testified that this information would generate a sense of insecurity and instability in the children, it could create a great deal of anxiety, and could impair their ability to function in an adaptive manner.
The circuit court properly considered this other evidence, and after balancing the testimony, found that the testimony of Dr. Moore was outweighed by other evidence. The circuit court considered Dr. Moore's testimony and found it to be less credible in light of the testimony of Drs. Eisemann and Matusiak. The circuit court stated: "I have listened carefully to the testimony of Dr. Moore, and I think it is not as credible or convincing as the conclusions and opinions of Dr. Eisemann and Dr. Matusiak." The circuit court also stated: "Based on the record there appears to be excellent adjustment and normal development of healthy, physically and mentally appropriately developing children; that the family structure appears to be strong; the children are bonded to their parents; they appear to be bonded to one another and their siblings; and that, as Dr. Eisemann testified in her opinion, that nothing good can come of this family structure by the adjudication of paternity."
[16]
We conclude, as the circuit court did, that in the balance the best interests of the children will not be served by a judicial determination of paternity. The existing family unit should be kept intact, not for the benefit of M.C.S. or R.J.S., but for the benefit of C.A.S. and C.D.S., whose interests in this matter are paramount. While we recognize that there are potential longterm effects (medical and psychological) to this decision, on balance the financial and emotional well-being of the children now and in the future is better served by prohibiting blood tests. In light of the evidence *1040 presented at trial: the testimony of the two doctors, the strong emotional relationship between R.J.S. and the children, and the lack of such a relationship between W.W.W. and the children, we conclude that it is not in the best interests of the children to order a determination of paternity in this case.
By the Court.The decision of the court of appeals is affirmed.
NOTES
[1] Section 767.458(1m), Stats., provides:

In an action to establish the paternity of a child who was born to a woman while she was married, where a man other than the woman's husband alleges that he, not the husband, is the child's father, a party may allege that a judicial determination that a man other than the husband is the father is not in the best interest of the child. If the judge or court commissioner determines that a judicial determination of whether a man other than the husband is the father is not in the best interest of the child, no blood tests may be ordered and the action shall be dismissed.
[2] Section 767.45(1)(d), Stats., provides:

Determination of paternity. (1) The following persons may bring an action or motion for the purpose of determining the paternity of a child or for the purpose of rebutting the presumption of paternity under s. 891.405 or 891.41:
. . ..
(d) A man alleged or alleging himself to be the father of the child.
[3] W.W.W. alleged that he and M.C.S. had sexual relations from 1979 until 1983, and that he and she had taken deliberate steps to conceive C.A.S. M.C.S. alleged that she had sexual relations with both W.W.W. and R.J.S. during this period.
[4] Section 806.04, Stats. 1977-78, provided, in part: "If a statute . . . is alleged to be unconstitutional, the attorney general shall also be served with a copy of the proceeding and be entitled to be heard."
[5] W.W.W. argues that it is not the statutory section itself that is unconstitutional, but rather that its application denies him his constitutional rights.
[6] We recognize that the failure to notify the attorney general does not create a jurisdictional bar to our review, because this proceeding is not a declaratory judgment, subject to sec. 806.04(11), Stats. Rather, the Kurtz rule is a "judicially mandated rule of procedure," and the failure to notify the attorney general is a curable defect. Fessler, 100 Wis. 2d at 444.
[7] Additionally, the petitioner brings his challenge to the statute based on the Wisconsin Constitution for the first time before this court. Consideration of constitutional issues raised for the first time on appeal is discretionary with this court, and will be done if "it is in the best interests of justice to do so, if both parties have had the opportunity to brief the issue and if there are no factual issues that need resolution." In Interest of Baby Girl K., 113 Wis. 2d 429, 448, 335 N.W.2d 846 (1983) (citing Laufenberg v. Cosmetology Examining Bd., 87 Wis. 2d 175, 187, 274 N.W.2d 618 (1979)).

Challenges based upon the Wisconsin Constitution were only briefly addressed by the parties in this case. The court of appeals did not address these issues. We do not find it to be "in the best interests of justice" to address these issues now. The court of appeals declined to address the procedural due process challenge because W.W.W. did not notify the attorney general. Also, that court did not address W.W.W.'s equal protection challenge. Although W.W.W. made reference to the equal protection clause in his brief before the court of appeals, he principally argued that his substantive due process rights had been violated.
In essence, the only constitutional challenge raised before and addressed by the court of appeals was W.W.W.'s substantive due process challenge. See Bankers Life and Cas. Co. v. Crenshaw, 108 S. Ct. 1645 (1988) (where Supreme Court refused to address constitutional issues not properly raised and passed upon in lower court). Because W.W.W. failed to notify the attorney general, and for the reasons in this footnote, we decline to decide any constitutional challenges, except the substantive due process challenge.
[8] California Evid. Code Ann. sec. 621 (1989 West Supp.) provides:

Legitimacy. Notwithstanding any other provision of law, the issue of a wife cohabitating with her husband, who is not impotent or sterile, is conducively presumed to be a child of the marriage.
[9] The plurality found that this interest was not "so rooted in the traditions and conscience of our people as to be ranked as fundamental." Michael H., 109 S. Ct. at 2345 n.6 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105 (1934)).
[10] W.W.W. attempts to distinguish this case from Michael H. on the ground that Cal. Evid. Code Ann. sec. 621, the California statute that was the basis for Michael H.'s constitutional challenge, creates a stronger presumption of paternity than does sec. 891.41(1), Stats.

Section 891.41(1) provides:
Presumption of paternity based on marriage of the parties. A man is presumed to be the natural father of a child if any of the following applies:
(1) He and the child's natural mother are or have been married to each other and the child is conceived or born after marriage and before the granting of a decree of legal separation, annulment or divorce between the parties.
This case is distinguishable, W.W.W. argues, because in Wisconsin, any of the parties listed in sec. 767.45(1), Stats., can challenge the presumed father's paternity, while in California, only the husband or wife can rebut this presumption. Cal. Evid. Code Ann. Sec. 621(c) and (d). Because the Wisconsin statutes do not give the presumed father this "conclusive presumption" of paternity, W.W.W. argues, Michael H. does not control the outcome of this case. While we recognize the distinction between the statutes, we refuse to construe the Michael H. decision so narrowly. The ultimate analysis in both cases is the same: Does the statute itself or the application of the statute infringe on a putative father's constitutional right to a relationship with children born into an extant marital family?
[11] One difference in this case is that W.W.W. has not been given the opportunity to establish his paternity through a blood test, as was Michael H. We do not find this difference to be consequential, however, as W.W.W.'s interest in having a blood test is subordinate to his ultimate interest; which is to establish a relationship with the children, obtain custody or visitation rights, or to satisfy his curiosity.
[12] 1979 Wis. Laws Ch. 352.
[13] 1987 Wis. Act 27, sec. 2137(d).
[14] It is unclear, in light of Michael H., whether W.W.W. could ever have a constitutionally protected interest in establishing his parentage of or a relationship with C.A.S. and C.D.S., regardless of the nature of his relationship with them. Because we conclude that he did not have a relationship with the children anywhere near the relationships established in Stanley and Caban, we do not reach this question.
[15] 1987 Wis. Act 413, sec. 1, provides:

Legislative finding and declaration. The legislature finds that it is in the interest of each child to identify the child's father for reasons including medical information and financial support. The legislature declares that it is the policy of this state to promote the interest of children in knowing the identity of both parents.
[16] See Governor Thompson's Veto Message for 1987, Wis. Act 27 (S.B. 100) 68.